## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ALABAMA, SOUTHERN DIVISION

| | | |
|---|---|---|
| SHAMIKA JONES, on behalf of<br>Herself and all others similarly situated, | ) | |
| | ) | |
| Plaintifs, | ) | |
| | ) | |
| v. | ) | Civil Action No.: __16-622__ |
| | ) | |
| COTY, INC., a Delaware Corporation; | ) | |
| THE PROCTER & GAMBLE | ) | |
| COMPANY, INC., an Ohio Corporation; | ) | |
| THE PROCTER & GAMBLE | ) | |
| MANUFACTURING COMPANY, INC., | ) | |
| an Ohio Corporation; | ) | **CLASS ACTION COMPLAINT** |
| THE PROCTER & GAMBLE | ) | **FOR EQUITABLE RELIEF** |
| DISTRIBUTING, L.L.C., | ) | **AND DAMAGES** |
| a Delaware Limited Liability Company; | ) | |
| PROCTER & GAMBLE HAIR CARE, | ) | |
| L.L.C., a Delaware Limited Liability | ) | |
| Company; | ) | |
| Defendants. | ) | |

## CLASS ACTION COMPLAINT

Plaintiff, Shamika Jones, on behalf of herself and all others similarly situated, brings this class action against Defendant, COTY, Inc., The Procter & Gamble Company, Inc., The Procter & Gamble Manufacturing Company, Inc., The Procter & Gamble Distributing, L.L.C., and Procter & Gamble Hair Care, L.L.C. (*collectively* "Defendants" *or* "Clairol Defendants"), and alleges on personal knowledge, investigation of her counsel, and on information and belief as follows:

## INTRODUCTION

1.      This is a class action brought by Plaintiff Shamika Jones, on behalf of herself and all others similarly situated persons, against COTY, Inc., The Procter & Gamble Company, Inc., The Procter & Gamble Manufacturing Company, Inc., The Procter & Gamble Distributing, L.L.C., and Procter & Gamble Hair Care, L.L.C. Plaintiff seeks damages and equitable remedies for herself and the putative Class, which includes consumers who purchased Clairol Balsam Color hair dyeing kit (*also labeled as "The Balsam Color Kit"*) (*hereinafter* "the Product").

2.      The Plaintiff's claims are for Unjust Enrichment (Count I), VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT (Count II), Breach of Express Warranty (Count III), Breach of Implied Warranty (Count IV), violation of the ALABAMA DECEPTIVE TRADE PRACTICES ACT (Count V), Fraud (Count VI), and Negligent Design and Failure to Warn (Count VII).

## PARTIES

3.      Plaintiff, Shamika Jones, is a resident citizen of Mobile, Alabama, Mobile County.

4.      Defendant, Coty, Inc. (*hereinafter* "Coty"), is a Delaware Corporation with a Principal Place of Business located at 350 5th Avenue, New York, New York 10118. According to the Delaware Secretary of State, Defendant, Coty, Inc., can be served by registered agent as follows:

Corporation Service Company
2711 Centerville Road
Suite 400
Wilmington, Delaware 19808

5.      Defendant, The Procter & Gamble Company, Inc. (*hereinafter* "P&G Corp."), is an Ohio Corporation with a Principal Place of Business located at 1 Procter & Gamble Plaza, Cincinnati, Ohio 45202-3315. According to the Ohio Secretary of State, Defendant The Procter & Gamble Company, Inc., can be served by registered agent as follows:

CT Corporation System
1300 East Ninth Street
Cleveland, Ohio 44114

6.      Defendant, The Procter & Gamble Manufacturing Company, Inc. (*hereinafter* "P&G Manufacturing"), is an Ohio Corporation with a Principal Place of Business located at 3875 Reservoir Road, Lima, Ohio 45801-3310. According to the Ohio Secretary of State, Defendant the Procter & Gamble Manufacturing Company, Inc., can be served by registered agent as follows:

CT Corporation System
1300 East Ninth Street
Cleveland, Ohio 44114

7.      Defendant, The Procter & Gamble Distributing, L.L.C., is a Delaware Limited Liability Company with a Principal Place of Business located at 6280 Center Hill Drive, Cincinnati, Ohio 45224. According to the Delaware Secretary of

State, Defendant The Procter & Gamble Distributing, L.L.C. can be served by registered agent as follows:

The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware 19801

8.     Defendant, Procter & Gamble Hair Care, L.L.C., is a Delaware Limited Liability Company with a Principal Place of Business located at 2200 Lower Muscatine Road, Iowa City, Iowa 52240. According to the Delaware Secretary of State, Defendant Procter & Gamble Hair Care, L.L.C. can be served by registered agent as follows:

The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware 19801

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 Class members, the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one Class member, Plaintiff Shamika Jones, is a citizen of a state different from at least one Defendant.

10.     This Court has personal jurisdiction over Defendants as many of the acts and omissions giving rise to this action occurred in the State of Alabama,

including purchases of the Product by the Plaintiff and other putative Class Members. Defendants have sufficient minimum contacts with the State of Alabama and intentionally availed themselves, and continue to avail themselves of the jurisdiction of this Court through their business ventures; specifically, the promotion, sale, marketing, and distribution of their products, including the Product, in this State.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred in this District as Defendants do business throughout this District, including promoting, selling, marketing and distributing the Product at issue, and the named Plaintiff purchased the Product in this District.

## GENERAL FACTUAL ALLEGATIONS
## COMMON TO ALL CLASS MEMBERS

12.     Defendants The Procter & Gamble Company, Inc., The Procter & Gamble Manufacturing Company, Inc., The Procter & Gamble Distributing, L.L.C., and Procter & Gamble Hair Care, L.L.C. have developed, designed, formulated, manufactured, packaged, labeled, advertised, marketed, instructed on (*how to use the Product*), warned about, distributed and sold the Clairol hair dye products (*i.e., "hair color kits"*) since at least 1956, when they were introduced

under the brand name "Miss Clairol" as the "FIRST at home hair color kit that could lighten, tint, condition and shampoo hair in one step".[1]

13.    In or around July of 2015, Defendant The Proctor & Gamble Company, Inc. announced the intended "merger" (*i.e., sale*) of 43 of its brands with Defendant Coty, Inc., including the "Clairol Balsam Color" brand. In or around October of 2016 the deal was finalized and valued at approximately $12.5 billion.

14.    The Product is a cosmetic hair dye intended to improve appearance and alter hair color, and is sold online and in retail shops including, but not limited to, Amazon, Walgreens, Jet.com, Wal-Mart, Clairol-Balsam-Color.best-deal.com, makeupalley.com, soap.com, and other cosmetic and beauty supply stores nationwide.

15.    Defendants' labeling markets the Product to women as "designed to give you hair with three signs of beautiful color: VIBRANT ● SHINY ● LASTING", and as "PERMANENT COLOR ● 100% GRAY COVERAGE"; as having an "Easy-to-use tear-tip applicator and shampoo-in formula"; and as having "the same great formula" of other versions (*i.e., colors*) in their "Balsam Color" hair dyeing line of Products.

---

[1] https://www.clairol.com/en-US/inside (*last visited Nov. 29, 2016*).

16.    Defendants market the Product on the clairol.com[2] website as a "luxurious formula", "enriched with conditioning botanicals to coat each strand" that "softens hair", "hydrates locks for soft, silky hair", that is "available in 16 shades", and has "benefits" such as "easy-to-use application", amongst other representations. Defendants further claim the Clairol brand to be "YOUR COLOR EXPERT".[1]

17.    Defendants represent that "The Science & Ingredients" are their "most hydrating formula" and that the Product is "infused with conditioning botanicals"[1] and that the Clairol brand, "makes the best at home hair color products around".[3]

18.    Defendants, as manufacturers of the Product, are held to the level of knowledge of an expert in the field of that type of hair care product, and had a duty to warn its consumers, including the Plaintiff and putative Class Members, of the true risks and dangers associated with using the Product. However, as set forth herein, Defendants failed to do so.

19.    Because the U.S. FOOD AND DRUG ADMINISTRATION has limited enforcement ability to regulate cosmetic companies under the FOOD, DRUG & COSMETIC ACT, 21 U.S.C. § 301 *et seq.*, consumers, including the Plaintiff and

---

[2] https://www.clairol.com/en-US/products/hair-color/balsam (*last visited Nov. 29, 2016*).

[3] https://www.clairol.com/en-US/beauty-school/article/common-color-questions (*last visited Nov. 29, 2016*).

putative Class Members, rely exclusively on cosmetic companies like Defendants

who have the autonomy to decide whether to manufacture and distribute safe

products. Here, the Plaintiff and putative Class Members relied, to their detriment,

on Defendants, who opted to manufacture and distribute a hair product, the

Product, which is defective in design and/or manufacture.

20.     As described herein, an inherent design and/or manufacturing defect

in the Product causes physical injuries and damages including the following:

        a.     significant hair loss;
        b.    skin and scalp irritation;
        c.    scalp burnings and blistering;
        d.    severe dermatitis;
        e.    eye irritation and tearing;
        f.    asthma;
        g.    gastritis;
        h.    renal damage and/or failure;
        i.    vertigo;
        j.    tremors, convulsions and comas; and
        k.    eczematoid contact dermatitis [in chronic (long-term) expose situations].

(*hereinafter* "the Injuries").

21.     Even if used as directed, Defendants failed to adequately warn against

the negative risks, side effects, and Injuries associated with the Product, including

the Injuries set forth above and elsewhere herein, and the long-term and cumulative

effects of usage of the Product.

22.     Because the Defendants failed (*and continue to fail*) to adequately warn against the negative risks, side effects, and Injuries associated with the Product, the Plaintiff and the putative Class Members believed the Product to be safe to use.

23.     Defendants' failed to disclose the inherent design and/or manufacturing defects of the Product, which were known to Defendants, or in the exercise of reasonable care should have been known to the Defendants. These defects were unknown to the Plaintiff and putative Class Members at the time of purchase and/or use, and thus constitute an actionable misrepresentation or omission, as well as an unfair, unlawful, fraudulent, and deceptive business practice.

24.     If Defendants had disclosed to Plaintiff and putative Class Members the true nature of the Product, that it could cause severe Injuries when used as instructed by Defendants, they would not have purchased the Product.

25.     The Plaintiff and putative Class Members have been damaged by Defendants' concealment and non-disclosure of the true defective nature of the Product because they were misled regarding the safety and value of the Product.

26.     Contrary to Defendants' labeling and marketing representations, the Product contains caustic ingredients including, but not strictly limited to, p-Phenylenediamine (*hereinafter* "PPD") that can and do cause Injuries. The amount

of PPD in the Product varies depending on which of the specific 16 "shades" of the Product a consumer purchases.[4]

27.     As a direct and proximate result of the defective nature of the Product, it is unfit for its intended use and purpose.

28.     The Injuries caused by the Product are not *de minimus*. Consumers damaged by the Product often have permanent hair loss, amongst other Injuries. Plaintiff and the putative Class Members have suffered injury in fact, including economic damages, as a direct and proximate result of purchasing and/or using the Product.

29.     Defendants' claims are deceptive, inaccurate, misleading, and not supported by scientific fact.

30.     Defendants, as "hair color experts", knew or should have known that even when used as directed, the Product creates an unnecessary risk of injury, as described herein, and failed to disclose or otherwise adequately warn against the negative effects, risks, and potential injuries associated with using the Product.

31.     In omitting, concealing, and inadequately providing critical safety information regarding the risks of using of the Product, and in order to induce its purchase and use, Defendants engaged in and continue to engage in conduct likely

---

[4] https://www.clairol.com/m/master/pdf/Balsam_ingredients.pdf (*last visited Nov. 29, 2016*).

to mislead and/or deceive consumers including the Plaintiff and putative Class Members; Defendants' conduct is fraudulent, unfair, and unlawful.

32.    Defendants knew or should have known that the chemicals in the Product, including, but not strictly limited to, "PPD", are associated with health risks including the Injuries set forth herein yet, Defendants did not (*and continue to fail to*) adequately warn consumers, including the Plaintiff and putative Class Members of the risk of Injuries.

33. In 2006, PPD was named allergen of the year by the AMERICAN CONTACT DERMATITIS SOCIETY. Defendants knew or should have known of these findings.

34.    The U.S. ENVIRONMENTAL PROTECTION AGENCY lists several links between PPD use/exposure and several acute and significant health problems including, but not strictly limited to:

      a.    Severe dermatitis;
      b.    Eye Irritation and Tearing;
      c.    Asthma;
      d.    Gastritis;
      e.    Renal failure;
      f.    Vertigo;
      g.    Tremors, convulsions and comas; and
      h.    Eczematoid contact dermatitis may occur in chronic (long-term) expose situations.

See p-Phenylenediamine "Hazard Study"
https://www.epa.gov/sites/production/files/2016-09/documents/p-phenylenedia

mine.pdf.

35.    Defendants do not warn about _any_ of the conditions listed in the preceding paragraph on their packaging or product inserts.

36.    16 CFR § 1500.13 states that the U.S. CONSUMER PRODUCT SAFETY COMMISSION has determined that PPD is one of five substances meeting the definition of a "strong sensitizer"; specifically, PPD and products that contain PPD are deemed to "have a significant potential for causing hypersensitivity". Defendants knew or should have known of these findings.

37.    Similarly, the NATIONAL INSTITUTE FOR OCCUPATIONAL SAFETY AND HEALTH (_under the oversight of the_ U.S. CENTER FOR DISEASE CONTROL) _International Chemical Safety Card_ notes that repeated occupational dermal exposure to PPD "may cause skin sensitization" and that PPD "may have effects on the kidneys, resulting in kidney impairment".

See http://www.cdc.gov/niosh/ipcsneng/neng0805.html [page last updated July 1, 2014] (_last visited Nov. 29, 2016_).

Defendants knew or should have known of these findings.

38.    A 2006 article published in the _Journal of Toxicology and Environmental Health_ found a link, in at least one scientific study, between hair dyes and certain cancers including bladder cancer, non-Hodgkin's lymphoma, and blood cancers such as myeloma and leukemia. See Rollison, D.E.; Helzlsouer, K.J.; Pinney, S.M., (2006), PERSONAL HAIR DYE USE AND CANCER: A SYSTEMATIC

LITERATURE REVIEW AND EVALUATION OF EXPOSURE ASSESSMENT IN STUDIES PUBLISHED SINCE 1992. JOURNAL OF TOXICOLOGY AND ENVIRONMENTAL HEALTH. Part B, Critical reviews. 9 (5): 413–39. Defendants knew or should have known of these findings.

39.     Defendants have placed no restrictions or warnings concerning cumulative or repeated use of the Product or PPD on the Products packaging, packet inserts or marketing materials despite the known, published findings of risks of repeated exposure to PPD.

40.     Once a person has become sensitized to PPD (*i.e., has suffered a significant reaction*) that sensitization is likely to remain with them for life. Defendants knew or should have known about the increased risk for hypersensitization but Defendants failed to put instructions or warnings related to PPD sensitization and hypersensitization.

41.     Defendants did not (*and still do not*) adequately warn consumers, including the Plaintiff and the putative Class Members, on their product labels, inserts, or marketing materials that the PPD in the Product can cause severe Injuries, including systemic anaphylaxis. See Goldberg, B.J., Herman, F.F., Hirita, I., SYSTEMIC ANAPHYLAXIS DUE TO AN OXIDATION PRODUCT OF P-PHENYLENEDIAMINE IN A HAIR DYE. *Ann. Allergy*, 1987; 58(3):205-8.

42.     There are safer and cheaper alternatives to PPD available to Defendants for use in the Product. However, despite the known risks of PPD, Defendants continue to use PPD in the Product.

43.     Safer known alternatives include but are not limited to:

    a.      Henna based hair dyes;

    b.      Para-toluenediamine sulfate hair dyes; and

    c.      Other semi-permanent dyes.

44.     Furthermore, Defendants fail to warn or disclose that African American consumers are at dramatically higher risk of an acute reaction to PPD than those of Caucasian decent.

45.     In 2001, a study performed by the CLEVELAND CLINIC concluded that the sensitization rate of PPD in African American users was 10.6% versus 4.5% in Caucasian users. The study further concluded that the sensitization rate of PPD in African American men in particular was 21.2% compared to 4.2% in Caucasians. See Dickel, H., Taylor, J.S., Evey, P., Merk, H.F., COMPARISON OF PATCH TEST RESULT WITH A STANDARD SERIES AMONG WHITE AND BLACK RACIAL GROUPS. *Am. J. Contact. Dermat.* 2001; 12(2):77-82. Thus, while the Product has an unacceptable and unreasonable rate of adverse reaction in the general population, the rate of adverse reaction is even more unacceptable and unreasonable rate of adverse reaction in African Americans.

46.   Defendants knew or should have known that consumers were at a greater risk of experiencing an adverse reaction while using PPD compared to other hair dye products, and Defendants knew or should have known that consumers African Americans were at an even greater risk of experiencing an adverse reaction to PPD.

47.   Although, consistent with 21 U.S.C. § 361(a), Defendants instruct users to conduct a preliminary test to help determine whether a user will have an adverse reaction to the Product, the preliminary test Defendants recommend and the directions and instructions for its administration are inadequate.

48.   The MAYO CLINIC reported the incidence of positive patch-test reactions to PPD in "patch test results" conducted between 1998 and 2000 at five-percent (5%) of the population of tested individuals. See Wetter D.A., Davis M.D.P., Yiannias J.A., *et al*., PATCH TEST RESULTS FROM THE MAYO CLINIC CONTACT DERMATITIS GROUP, 1998-2000. J. Am. Acad. Dermatol. 2005; 53:416-21. Defendants knew or should have known of these findings.

49.   Similarly, the NORTH AMERICAN CONTACT DERMATITIS GROUP reported the incidence of positive patch-test reactions in "patch test results" conducted between 2001 and 2002 at just under five-percent (5%) of the population of tested individuals. See Pratt M.D., Belsito D.V., DeLeo V.A., *et al*. NORTH AMERICAN CONTACT DERMATITIS GROUP PATCH TEST RESULTS, 2001-2002

STUDY PERIOD. *Dermatitis* 2004; 15(4):176-83. Defendants knew or should have known of these findings.

50.     Later, the NORTH AMERICAN CONTACT DERMATITIS GROUP reported the incidence of positive patch-test reactions in "patch test results" conducted between 2005 and 2006 at five-percent (5%) of the population of tested individuals. See Pratt, M.D., Belsito, D.V., DeLeo, V.A., *et al*. NORTH AMERICAN CONTACT DERMATITIS GROUP PATCH TEST RESULTS, 2005-2006 STUDY PERIOD. *Dermatitis* 2009; 20(3):149-60. Defendants knew or should have known of these findings.

51.     Despite the abundance of scientific and other published material evidencing a certain percentage of the population would have an allergic reaction to the Product, Defendants failed to warn or disclose such rates of reaction to consumers and the public in general, including the Plaintiff and the putative Class Members, and, therefore, failed to adequately warn of the true nature of the risks of using the Product.

52.     Defendants recommend a self-applied, at-home "skin patch test" on a consumer's arm/elbow prior to use. Defendants recommend this test despite knowing that the skin on the scalp/head is more sensitive and may react differently than the arm/elbow or other parts of the body. Defendants provide no guidelines on how to test the Product on a consumer's head and/or scalp prior to use.

53.     Defendants knew or should have known that their recommended at-home skin patch test is an inadequate method to determine if a user will have an adverse reaction to PPD.

54.     The universal standard for identifying skin allergies, including acute contact dermatitis to PPD, is a patch test which is administered and monitored by a dermatologist or similar trained medical professional (*a "medical skin patch test"*) over a 7-10 day period.

55.     During a "medical skin patch test" a trained medical professional places small quantities of known allergens, such as PPD, on the patient's back. The test areas are then covered with special hypoallergenic adhesive tape so the patches stay in place undisturbed for 48 hours.

56.     Generally, a "medical skin patch test" requires two to three appointments so that the reactions can be carefully monitored by the trained medical professional.

57.     Despite the knowledge that more accurate patch tests conducted by trained medical professionals are done over the course of several days or even weeks, Defendants wrongly and negligently fail to advise consumers, including the Plaintiff and putative Class Members, of the need and corresponding health benefit of having a "medical skin patch test" performed before using the Product.

58.   In December 2007, the EUROPEAN COMMISSION SCIENTIFIC COMMITTEE ON CONSUMER PRODUCTS released an Opinion titled "*Sensitivity to Hair Dyes – Consumer Self Testing*." The COMMITTEE concluded that at home skin tests, given for the purpose of providing an indication as to whether an individual consumer may or may not have a contact allergy to hair dye chemicals, were unreliable. The Committee specifically found that:

a.   Self-testing leads to misleading and false-negative results thus giving individuals who are allergic to hair dye substances the false impression that they are not allergic and not at risk of developing an allergic reaction by dyeing their hair;

b.   There is a potential risk that "self-tests" result in induction of skin sensitization to hair dye substances;

c.   The self-test recommendations were not standardized and uncontrolled allowing for large variations in dose, number of applications, and duration of exposure;

d.   False negative results from self-testing are considered to be the largest problem;

e.   48 hours known to be too short as patch test reactions may develop up to seven days after application;

f.   Self-test locations on the arm or behind the ear are not reliable, while patch testing done on the back is good for reproducibility; and

g.   Self-tests are not performed or observed by trained observers.

See http://ec.europa.eu/health/ph_risk/committees/04_sccp/docs/sccp_o_114.pdf (*last visited Nov. 29, 2016*).

59.     Defendants did not (*and currently do not*) warn or disclose that self-testing, such as the test recommended by Defendants, is inferior to a patch test administered and monitored by a dermatologist or similar trained medical professional (*a "medical skin patch test"*), is not an effective or reliable to determine whether an individual consumer may or may not have a contact allergy to PPD.

60.     Nowhere on their product packaging or inserts, webpage, or marketing materials do Defendants recommend that consumers undergo a "medical skin patch test" before using the Product.

61.     Defendants instruct a consumer to "not wash, cover, or disturb the test area for 48 hours." Compliance with Defendants' version of an "allergy test" is unreasonable and essentially unfeasible. The risk of accidental contamination is simply probable because the average consumer is not trained to conduct a test comparable to a "medical skin patch test". This renders the consumer performed test useless.

62.     For example, during Defendants' version of an allergy test, for two days, consumers are unrealistically expected to:

    a.     Not shower;

    b.     Not wear long sleeve shirts;

    c.     Not accidently rub against anything;

      d.     Not sweat; and

      e.     Not close their elbow.

63.    Defendants knew or should have known that a percentage of consumers would have an allergic reaction to their products but fail to advise consumers to undergo proper allergy testing (*i.e., a "medical skin patch test"*) before using the Product.

64.    Defendants knew or should have known that their recommended test was not adequate because:

      a.     The instructions and directions for use did not disclose that Defendants' at-home test was not a substitute for a "medical skin patch test" and that more accurate results could and would be obtained by conducting a "medical skin patch test";

      b.     The risk that the Defendants' at-home test would be performed in the wrong area;

      c.     the risk that the amount of the Product used in the Defendants' at-home test would be wrong;

      d.     the arm is not the appropriate location for a skin allergy test, especially since the Product is to be used on the head and scalp;

      e.     the risk of false negatives is high;

      f.     the area that is tested is not covered or protected during the test; and

      g.     The risk that the product would be disturbed by clothing or daily activities is high.

65.     Consumers, including the Plaintiff and putative Class Members, detrimentally relied on Defendants' instructions to perform an at-home patch test.

66.     Defendants knew or should have known that it is highly unlikely that a consumer would be able to (i) perform Defendants' at-home patch test properly, and (ii) obtain reliable results.

67.     In addition, Defendants know or should have known that sensitization to PPD during performance of an at-home skin patch test is likely to occur in a certain percentage of the population.

68.     When sensitization occurs during a patch test, the consumer will have a late reaction to the PPD more than 48 hours, or not at all, after exposure rendering the Defendants testing procedure unreliable and, therefore, useless.

69.     Due to the potential for PPD sensitization during a patch test, it is possible for consumers to have a negative skin patch test result and still have a severe reaction when they use the Product.

70.     Despite this fact, Defendants did not (*and still do not*) warn or disclose the risks of sensitization during a skin patch test.

71.     Defendants' further provide inadequate skin patch test instructions in that Defendants use ambiguous words such as "small" and "equal" parts without providing any direction as to what equates to "small" or what tools or methods to

measure the actual amount of each chemical to ensure that "equal" amounts are being applied (*i.e., a teaspoon, a tablespoon?*).

72.     Defendants failure to provide any instructions on what is meant by a "small" amount of chemical(s) leaves the consumer to guess/speculate as to the proper testing amount. Consequently, the Defendants' instructions on the at-home skin patch testing procedure are fundamentally flawed.

73.     Without precise measuring amounts and/or tools, it is impossible to determine what a "small" amount is and if "equal" amounts of each chemical are being mixed for skin patch testing purposes.

74.     Even if the product's patch test was adequate and reliable, which it is not, the vague, ambiguous, and inadequate instructions for its use render the test wholly inadequate and utterly useless. Thus, Defendants fail to adequately warn or disclose the probability that a user will have an adverse reaction to Product by virtue of their at-home skin patch test instructions.

75.     Despite this knowledge, Defendants failed (*and continue to fail*) to adequately warn or disclose to their consumers that they were exposed to a significantly increased risk of suffering an adverse reaction as a direct and proximate result of using the Product.

76.     Instead, as self-proclaimed "hair color experts", Defendants represent the Product to be safe and effective, particularly when used as directed, including

performing their at-home skin patch test, and actively market the Product to consumers, including the Plaintiff and putative Class Members, knowing it is likely to cause serious and severe Injuries.

77.    The Plaintiff and the putative Class Members are unaware of a single clinical trial or study performed by Defendants related to the injury rate and/or safety of the Product.

78.    Given the amount of literature dating back decades relating PPD to serious adverse health events, including the Injuries described herein, Defendants conduct is particularly egregious.

## **PLAINTIFF'S FACTUAL ALLEGATIONS**

79.    Plaintiff Shamika Jones purchased Clairol Balsam Color Black 618 on or about January 2015.  On or about January 10, 2015, she performed the patch test as directed without incident. She waited a week before placing the product on her scalp.

80.    On or about January 17, 2015, after reading the product instructions, Plaintiff Shamika Jones used the Clairol Balsam hair color Black 618 to dye her hair. Within a few hours, Plaintiff Shamika Jones, experienced itching and burning. By the following morning, the itching and burning had gotten worse and she experienced facial swelling requiring her to seek medical treatment.

81.   In sum, as a direct and proximate result of (1) the false, misleading and/or deceptive nature of Defendants' representations regarding the Product, and (2) the defective and dangerous nature of the Product, and (3) the Defendants' woefully inadequate instructions for use including, but not specifically limited to the skin test, Plaintiff Shamika Jones experienced the following injuries including, but not limited to: itching, burning, swelling, hair loss including permanent hair loss, puss and fluid leaking out of sores and burns on her scalp.

## CLASS ACTION ALLEGATIONS

82.   Plaintiff brings this action on her own behalf, and on behalf of the following Class pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and/or 23(b)(3). Specifically, the Class is defined as:

> All persons in the United States or its territories who, within the relevant and applicable statute of limitations period, purchased Clairol Balsam Color (*also labeled as "The Balsam Color Kit"*) that contained p-Phenylenediamine.

83.   Excluded from the Class are (a) any person who purchased the Product for resale and not for personal or household use, (b) any person who signed a release of any Defendant in exchange for consideration, (c) any officers, directors or employees, or immediate family members of the officers, directors or employees, of any Defendant or any entity in which a Defendant has a controlling interest, (d) any legal counsel or employee of legal counsel for any Defendant, and (e) the presiding Judge in the Lawsuit, as well as the Judge's staff and their

immediate family members. Plaintiff reserves the right to amend the definition of the Class if discovery or further investigation reveals that the Class should be expanded or otherwise modified.

84.    Plaintiff also brings this action on behalf of the following subclass pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and/or 23(b)(3).

> All residents of the State of Alabama who, within the relevant and applicable statute of limitations period, purchased Clairol Balsam Color (*also labeled as "The Balsam Color Kit"*) that contained p-Phenylenediamine.

85.    Excluded from the "Alabama Subclass" are (a) any person who purchased the Product for resale and not for personal or household use, (b) any person who signed a release of any Defendant in exchange for consideration, (c) any officers, directors or employees, or immediate family members of the officers, directors or employees, of any Defendant or any entity in which a Defendant has a controlling interest, (d) any legal counsel or employee of legal counsel for any Defendant, and (e) the presiding Judge in the Lawsuit, as well as the Judge's staff and their immediate family members.

86.    **Numerosity.** Class Members are so numerous and geographically dispersed that joinder of all Class Members is impracticable. While the exact number of Class Members remains unknown at this time, upon information and belief, there are thousands, if not tens of thousands of putative Class Members. Class Members may be notified of the pendency of this action by mail and/or

electronic mail, which can be supplemented if deemed necessary or appropriate by the Court with published notice.

87.  **Predominance of Common Questions of Law and Fact.** Common questions of law and fact exist as to all Members of the Class and predominate over any questions affecting only individual Class Members. These common legal and factual questions include, but are not limited to, the following:

a.  Whether Defendants failed to comply with their warranties;

b.  Whether Defendants' conduct constitutes a breach of applicable warranties;

c.  Whether the Product causes Injuries upon using the Product as directed by Defendants;

d.  Whether the Product contains design defects;

e.  Whether the Product is defective in its manufacture;

f.  Whether and when Defendants knew or should have known that the Product causes Injuries upon using the Product as directed by Defendants;

g.  Whether Defendants were unjustly enriched by selling the Product in light of their conduct as described herein;

h.  Whether Defendants' acts, omissions or misrepresentations of material facts constitute fraud;

i.  Whether Defendants' acts, omissions or misrepresentations of material facts violated certain state deceptive practice acts, including those of the State of Alabama;

j.  Whether Defendants' acts, omissions or misrepresentations of material facts make them liable to the Plaintiff and the putative Class for negligence and strict products liability;

k.  Whether the Plaintiff and putative Class Members have suffered an ascertainable loss of monies or property or other value as a result of Defendants' acts, omissions or misrepresentations of material facts;

l.  Whether the Plaintiff and putative Class Members are entitled to monetary damages and, if so, the nature of such relief; and

m.  Whether the Plaintiff and putative Class Members are entitled to equitable, declaratory or injunctive relief and, if so, the nature of such relief.

88.  Pursuant to Rule 23(b)(2), Defendants have acted or refused to act on grounds generally applicable to the putative Class, thereby making final injunctive or corresponding declaratory relief appropriate with respect to the putative Class as a whole. In particular, Defendants have designed, manufactured, marketed, sold and/or distributed a defective Product, which Defendants know or should have known causes Injuries to consumers upon using the Product, as directed by Defendants, and provided an inadequate disclosure and/or warning to consumers, including the Plaintiff and the putative Class Members, regarding these severe consequences.

89.  **Typicality.** Plaintiff's claims are typical of the claims of the Members of the putative Class and respective Subclass, as each putative Class and Subclass Member was subject to the same common, inherent defect in the Product. Plaintiff

shares the aforementioned facts and legal claims or questions with putative Class and Subclass Members, and the Plaintiff and all putative Class and Subclass Members have been similarly affected by Defendants' common course of conduct alleged herein. The Plaintiff and all putative Class and Subclass Members sustained monetary and economic injuries including, but not limited to, ascertainable loss arising out of Defendants' breach of warranties and other wrongful conduct as alleged herein.

90.   **Adequacy.** The Plaintiff will fairly and adequately represent and protect the interests of the putative Class and respective Subclass. Plaintiff have retained counsel with substantial experience in handling complex class action litigation, including complex questions that arise in this type of consumer protection litigation. Further, Plaintiff and her counsel are committed to the vigorous prosecution of this action.

91.   **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the present controversy for at least the following reasons:

> a.   The damages suffered by each individual putative Class Member do not justify the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct;
>
> b.   Even if individual Class Members had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed;

c.   The claims presented in this case predominate over any questions of law or fact affecting individual Class Members;

d.   Individual joinder of all putative Class Members is impracticable;

e.   Absent a Class, the Plaintiff and putative Class Members will continue to suffer harm as a result of Defendants' unlawful conduct; and

f.   This action presents no difficulty that would impede its management by the Court as a class action, which is the best available means by which the Plaintiff and putative Class Members can seek redress for the harm caused by Defendants.

92.   Alternatively, the Class may be certified for the following reasons:

a.   The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudication with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants;

b.   Adjudications of individual Class Members' claims against Defendants would, as a practical matter, be dispositive of the interests of other putative Class Members who are not parties to the adjudication and may substantially impair or impede the ability of other putative Class Members to protect their interests; and

c.   Defendants have acted or refused to act on grounds generally applicable to the putative Class, thereby making appropriate final and injunctive relief with respect to the putative Class as a whole.

## CAUSES OF ACTION
## COUNT I
## UNJUST ENRICHMENT
### (On behalf of the Nationwide Class and State Subclass)

93.     Plaintiff, individually and for the Class, incorporates by reference all preceding paragraphs as though fully set forth herein.

94.     Plaintiff asserts this cause of action on behalf of herself and the Nationwide Class as well as the Alabama subclass.

95.     A party is unjustly enriched when it retains a benefit to the detriment of another party against the fundamental principles of justice, equity, and good conscience.

96.     Defendants have been unjustly enriched by engaging in the wrongful acts and omissions set forth herein; transactions with Plaintiff and putative Class Members which were intended to result in, and did result in, sale of Defendants' Product.

97.     Defendants have been unjustly enriched after making false, deceptive and/or misleading representations in advertisements and on the labels and/or package inserts/instructions of the Product because Defendants knew, or should have known, that the representations made were unsubstantiated, false, deceptive and/or misleading.

98.     Defendants have reaped millions of dollars in revenue as a direct and proximate result of its scheme to mislead and deceive the Plaintiff and Class

members regarding its unsubstantiated, false, deceptive and/or misleading representations as set forth herein. That Defendants have amassed such earnings by virtue of deceptive and misleading behavior violates fundamental principles of justice, equity, and good conscience.

99.    The Plaintiff and putative Class Members have been damaged as a direct and proximate result of Defendants' unjust enrichment because they would not have purchased the Product on the same terms or for the same price had they known of the true dangers and hazards associated with use of the Product.

100.    Defendants continue to be unjustly enriched by the deceptive and misleading labeling and advertising of the Product.

101.    When required, the Plaintiff and Class Members are in privity with Defendants because Defendants' sale of the Product was either direct or through authorized sellers. Purchase through authorized sellers is sufficient to create such privity because such authorized sellers are Defendants' agents for the purpose of the sale of the Product.

102.    As a direct and proximate result of Defendants' wrongful conduct and unjust enrichment, the Plaintiff and putative Class Members are entitled to restitution of, disgorgement of, and/or imposition of a constructive trust upon all profits, benefits, and other compensation obtained by Defendants for their inequitable and unlawful conduct.

## COUNT II
## VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
## (15 U.S.C. § 2301, *et seq*.)
## (On behalf of the Nationwide Class)

103.   Plaintiff, individually and for the Class, incorporates by reference all preceding paragraphs as though fully set forth herein.

104.   Plaintiff asserts this cause of action on behalf of herself and the Nationwide Class.

105.   Defendants sold the Product as part of their regular course of business.

106.   The Plaintiff and putative Class Members purchased the Product either directly from Defendants or through authorized retailers such as Amazon, Wal-Mart, Walgreens and/or beauty supply and cosmetics stores, among others as set forth *supra*.

107.   The MAGNUSON–MOSS WARRANTY ACT, 15 U.S.C. §§ 2301, *et seq*., provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written warranty.

108.   The Product is a "consumer product" as that term is defined by 15 U.S.C. § 2301(1), as it constitutes tangible personal property which is distributed in commerce and which is normally used for personal, family or household purposes.

109.   The Plaintiff and putative Class Members are "consumers" and "buyers" as defined by 15 U.S.C. § 2301(3), since they are buyers of the Product for purposes other than resale.

110.   Defendants are entities engaged in the business of making and selling cosmetics, either directly or indirectly, to consumers such as the Plaintiff and the putative Class Members. As such, Defendants are "suppliers" as defined in 15 U.S.C. § 2301(4).

111.   Defendants made promises and representations in an express warranty provided to all consumers, which became the basis of the bargain between the Plaintiff, the putative Class Members, and the Defendants. Defendants expressly warranted that the Product was fit for its intended purpose by making the express warranties that:

    a.    Defendants are "hair color experts";

    b.    using the Product is "an easy coloring experience";

    c.    the Product has an "Easy-to-use tear-tip applicator and shampoo-in formula";

    d.    the Product is "the same great formula" across the entire line of products; specifically, other versions (*i.e., colors*) in the "Balsam Color" hair dyeing line of Products;

    e.    the Product contains a "luxurious formula";

    f.    the Product is "enriched with conditioning botanicals to coat each strand";

g.      the Product "softens hair";

h.      the Product "hydrates locks for soft, silky hair";

i.      the Product has "benefits" such as "easy-to-use application";

j,      the at-home skin patch test is reliable, in that a consumer will know for certain whether they are safe from suffering Injuries if they utilize the Product as directed; and

k.      the Product is "infused with conditioning botanicals".

112.  Defendants' aforementioned written affirmations of fact, promises and/or descriptions, as alleged, are each a "written warranty." The affirmations of fact, promises and/or descriptions constitute a "written warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).

113.  Defendants breached the applicable warranty because the Product suffers from latent and/or inherent defects that cause substantial Injuries, rendering it unfit for its intended use and purpose. The defects substantially impair the use, value and safety of the Product.

114.  The latent and/or inherent defects at issue herein existed when the Product left Defendants' possession or control and were sold to the Plaintiff and putative Class Members. The true nature of the defects were not discoverable by the Plaintiff or putative Class Members at the time of their purchase of the Product.

115.  All conditions precedent to seeking liability under this claim for breach of express warranty have been performed by or on behalf of the Plaintiff

and putative Class Members in terms of paying for the goods at issue. Defendants were placed on reasonable notice of the defect in the Product and their breach of the warranty, and have failed to cure the defects for the Plaintiff and putative Class Members, despite having reasonable time to do so.

116.  Defendants breached their express warranties since the Product did not contain the properties it was represented to possess.

117.  Defendants' breaches of warranties have caused the Plaintiff and putative Class Members to suffer Injuries, pay for a defective Product, and enter into transactions they would not have entered into for the consideration paid. As a direct and proximate result of Defendants' breaches of warranties, the Plaintiff and putative Class Members have suffered damages and continue to suffer damages, including economic damages in terms of the cost of the Product and the cost of efforts to mitigate the damages caused by using the Product.

118.  As a direct and proximate result of Defendants' breaches of these warranties, the Plaintiff and putative Class Members are entitled to legal and equitable relief including damages, costs, attorneys' fees, rescission, and all such other relief deemed appropriate, for an amount to compensate them for not receiving the benefit of their bargain.

119.  The Plaintiff and the putative Class therefore seek and are entitled to recover damages and other legal and equitable relief, injunctive relief and costs and

expenses (*including attorneys' fees based upon actual time expended*), as provided by 15 U.S.C. § 2310(d).

## COUNT III
## BREACH OF EXPRESS WARRANTY
### (On behalf of the Nationwide Class)

120.   Plaintiff, individually and for the Class, incorporates by reference all preceding paragraphs as though fully set forth herein.

121.   Plaintiff asserts this cause of action on behalf of herself and the Nationwide Class.

122.   Defendants manufactured, marketed, distributed and sold the Product as part of their regular course of business.

123.   The Plaintiff and the putative Class Members purchased the Product either directly from the Defendants or through authorized retailers such as Amazon, Wal-Mart, Walgreens, and/or beauty supply and cosmetics stores, among others as set forth *supra*.

124.   Defendants, as the designers, manufacturers, marketers, distributors, or sellers expressly warranted that the Product was fit for its intended purpose by making the express warranties that the Product was a safe hair dyeing product, as set forth with specificity herein.

125.   Defendants made the foregoing express representations and warranties nationwide to all United States consumers, which became the basis of the bargain

between the Plaintiff, the putative Class Members and Defendants, thereby creating express warranties that the Product would conform to Defendants' affirmations of fact, representations, promises, and descriptions; specifically, that:

     a.    Defendants are "hair color experts";

     b.    using the Product is "an easy coloring experience";

     c.    the Product has an "Easy-to-use tear-tip applicator and shampoo-in formula";

     d.    the Product is "the same great formula" across the entire line of products; specifically, other versions (*i.e., colors*) in the "Balsam Color" hair dyeing line of Products;

     e.    the Product contains a "luxurious formula";

     f.    the Product is "enriched with conditioning botanicals to coat each strand";

     g.    the Product "softens hair";

     h.    the Product "hydrates locks for soft, silky hair";

     i.    the Product has "benefits" such as "easy-to-use application";

     j,    the at-home skin patch test is reliable, in that a consumer will know for certain whether they are safe from suffering Injuries if they utilize the Product as directed; and

     k.    the Product is "infused with conditioning botanicals".

126.  Defendants breached the foregoing express warranties by placing the Product into the stream of commerce and selling it to consumers, when the Product does not contain the properties it was represented to possess. Rather, the Product

suffers from latent and/or inherent design and/or manufacturing defects that cause substantial Injuries, rendering the Product unfit for its intended use and purpose. These defects substantially impair the use, value and safety of the Product.

127.   The latent and/or inherent design and/or manufacturing defects at issue herein existed when the Product left Defendants' possession or control and was/were sold to the Plaintiff and other putative Class Members nationwide. The true nature of the defects were not discoverable by the Plaintiff and putative Class Members at the time of their purchase of the Product.

128.   As the manufacturers, suppliers, and/or sellers of the Product, Defendants had actual knowledge of the breach, and given the nature of the breach, (*i.e. false representations regarding the Product*), Defendants necessarily had knowledge that the representations made were false, deceptive and/or misleading.

129.   The Plaintiff and the putative Class Members were injured as a direct and proximate result of Defendants' breaches of warranties because they would not have purchased the Product if the true facts had been known; specifically, economic damages in connection with the purchase of the Product, and Injuries from using the Product as directed by Defendants.

130.   As a direct and proximate result of Defendants' breaches of these warranties, the Plaintiff and the putative Class Members are entitled to legal and equitable relief including damages, costs, attorneys' fees, rescission, and all such

other relief deemed appropriate, for an amount to compensate them for not receiving the benefit of their bargain.

## COUNT IV
## BREACH OF IMPLIEDWARRANTY
### (On behalf of the Nationwide Class)

131.   Plaintiff, individually and for the Class, incorporates by reference all preceding paragraphs as though fully set forth herein.

132.   Plaintiff asserst this cause of action on behalf of herself and the Nationwide Class.

133.   Section 2-314 of the UNIFORM COMMERCIAL CODE provides that, unless excluded or modified, a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. To be "merchantable," goods must, inter alia, "pass without objection in the trade under the contract description", "run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved", be "adequately contained, packaged, and labeled as the agreement may require", and "conform to the promise or affirmations of fact made on the container or label."

134.   Defendants formulated, manufactured, tested, marketed, promoted, distributed, and sold the Product as safe for use by the public at large, including the Plaintiff and putative Class Members who purchased the Product.

135.   Defendants knew the use for which the Product was intended and impliedly warranted the product to be of merchantable quality, safe and fit for use.

136.   The Plaintiff and putative Class Members reasonably relied on the skill and judgment of the Defendants, especially as self-professed "hair color experts", and as such their implied warranty, in using the Product.

137.   However, the Product was not and is not of merchantable quality or safe or fit for its intended use, because it is unreasonably dangerous and unfit for the ordinary purpose for which it was used. Specifically, the Product causes Injuries as set forth herein.

138.   Defendants breached their implied warranties because the Product does not have the quality, quantity, characteristics, or benefits as promised, and because the Product does not conform to the promises made on its labels and/or on Defendants' website.

139.   As a direct and proximate result of one or more of these wrongful acts or omissions of the Defendants, the Plaintiff and putative Class Members suffered injuries and damages.

140.   The Plaintiff and putative Class Members were injured as a direct and proximate result of Defendants' breach because they would not have purchased the Product if they had known the true facts - the Product did not and does not have the characteristics, quality, or value as impliedly warranted.

141.   As a direct and proximate result of Defendants' breaches of these warranties, the Plaintiff and the putative Class Members are entitled to legal and equitable relief including damages, costs, attorneys' fees, rescission, and all such other relief deemed appropriate, for an amount to compensate them for not receiving the benefit of their bargain.

## COUNT V
### Violation of the Alabama Deceptive Trade Practices Act
### (CODE OF ALABAMA §§ 8-19-1, *et seq.*)
### (On behalf of the Alabama Subclass)

142.   Plaintiff, individually and for the Alabama Subclass, incorporates by reference all preceding paragraphs as though fully set forth herein.

143.   Plaintiff asserts this cause of action on behalf of the Alabama Subclass.

144.   Defendants marketing, sale and/or distribution of the Products and the Plaintiff and the putative Alabama Subclass Members' purchase of the Products was a sale or distribution of goods to a consumer within the meaning of the ALABAMA DECEPTIVE TRADE PRACTICES ACT (CODE OF ALABAMA §§ 8-19-1, *et seq.*).

145.   The Plaintiff and putative Alabama Subclass Members' purchased the Product for personal, family, or household use.

146.   Defendants' acts and practices as described herein have misled and deceived and/or likely to mislead and deceive members of the Alabama Subclass

and the general public of the State of Alabama. Defendants have advertised, marketed, and sold the Product as being a safe hair dyeing product, as set forth herein. Thus, Defendant has wrongfully:

a.   represented that its goods (*i.e., the Products*) have sponsorship, approval, characteristics, ingredients, uses benefits or qualities that they do not have;

b.   represented that its goods (*i.e., the Products"*) are of a particular standard, quality, or grade, or that its goods (*i.e., the Products"*) are of a particular style or model, if they are of another;

c.   failed to provide adequate warnings or instruction that a manufacturer exercising reasonable care would and should have provided concerning the risk of suffering Injuries from use and/or repeated use of the Product, particularly in light of the likelihood that the Product would Injuries;

d.   knowingly, intentionally, and/or recklessly omitted, suppressed, and/ or concealed the true, unreasonably dangerous nature of the Product;

e.   knowingly, intentionally, and/or recklessly omitted, suppressed, and/or concealed that the use of the Product posed a significant risk of chemical burns, allergic reactions, and other Injuries, particularly among African Americans;

f.   knowingly, intentionally, recklessly, or negligently omitted proper warnings from being placed on its packaging, or otherwise calling attention to this dangerous propensity—which caused serious personal injuries in many consumers including the Plaintiff and numerous putative Class Members; and,

g.   engaged in unconscionable, false, misleading, and/or deceptive acts and/or practices in the conduct of trade or commerce – marketing, advertising, and selling the Product.

147.   By its actions, Defendant is disseminating uniform false advertising by its labeling, concerning the Product, which by its nature is unfair, deceptive, untrue, and/or misleading within the meaning of the ALABAMA DECEPTIVE TRADE PRACTICES ACT. Such actions are likely to deceive, do deceive, and continue to deceive the Alabama general public for all the reasons detailed herein above.

148.   Defendants intended for the Plaintiff and Alabama Subclass Members to rely on its representations and omissions and the Plaintiff and Alabama Subclass Members did rely on Defendant's misrepresentations and omissions of fact.

149.   The misrepresentations and omissions of fact constitute deceptive, false and misleading advertising in violation of the ALABAMA DECEPTIVE TRADE PRACTICES ACT.

150.   By performing the acts described herein Defendants caused monetary damage to the Plaintiff and Alabama Subclass Members of similarly situated individuals.

151.   Accordingly, Plaintiff requests the following relief both individually and on behalf of the Alabama Subclass Members:

a.   actual damages sustained by the Plaintiff and Alabama Subclass Members or the sum of $100.00, whichever is greater;

b.   three times actual damages;

c.   appropriate injunctive relief in the form of enjoining Defendant from continuing to violate Alabama statutory law;

     d.     attorneys' fees and costs; and

     e.     such other and further relief as the Court deems proper.

**COUNT VI**
**FRAUD**
**(On behalf of the Nationwide Class)**

152.  Plaintiff, individually and for the Class, incorporates by reference all preceding paragraphs as though fully set forth herein.

153.  Plaintiff asserts this cause of action on behalf of herself and the Nationwide Class.

154.  As described herein, Defendants knowingly made material misrepresentations and omissions regarding the Product in their marketing and advertising materials, including the package in which the Product is sold and which contains the Product.

155.  Defendants made these material misrepresentations and omissions in order to induce the Plaintiff and putative Class Members to purchase the Product.

156.  Rather than inform consumers about the dangers and hazards associated with using the Product, Defendants represent it as an "easy color experience", amongst other false and/or misleading representations as set forth herein, such as:

     a.     represented that its goods (*i.e., the Products*) have sponsorship, approval, characteristics, ingredients, uses benefits or qualities that they do not have;

Page 44 of 53

b.   represented that its goods (*i.e., the Products"*) are of a particular standard, quality, or grade, or that its goods (*i.e., the Products"*) are of a particular style or model, if they are of another;

c.   failed to provide adequate warnings or instruction that a manufacturer exercising reasonable care would and should have provided concerning the risk of suffering Injuries from use and/or repeated use of the Product, particularly in light of the likelihood that the Product would Injuries;

d.   knowingly, intentionally, and/or recklessly omitted, suppressed, and/ or concealed the true, unreasonably dangerous nature of the Product;

e.   knowingly, intentionally, and/or recklessly omitted, suppressed, and/or concealed that the use of the Product posed a significant risk of chemical burns, allergic reactions, and other Injuries, particularly among African Americans; and,

f.   knowingly, intentionally, recklessly, or negligently omitted proper warnings from being placed on its packaging, or otherwise calling attention to this dangerous propensity—which caused serious personal injuries in many consumers including the Plaintiff and numerous putative Class Members.

157.   The facts which Defendants omitted, suppressed, and/or concealed as alleged in the preceding paragraph were material in that they concerned facts that would have been important to a reasonable consumer, including the Plaintiff and putative Class Members, in making a decision whether to purchase the Product.

158.   In fact, the Product is not a safe hair dyeing product. Rather, it is composed of caustic ingredients including PPD which is not safe and can cause serious Injuries as set forth herein.

159.   The misrepresentations and omissions made by Defendants, upon which the Plaintiff and putative Class Members reasonably and justifiably relied, were intended to induce and did actually induce the Plaintiff and putative Class Members to purchase the Product.

160.   Defendants knew the Products ingredients, particularly PPD, were unsafe for use on the human head and/or scalp, but nevertheless made representations, as set forth herein, through its marketing, advertising and product labeling, in order to sell the product as a safe hair dyeing alternative. In reliance on these and other similar representations, the Plaintiff and putative Class Members were induced to, and did pay monies, to purchase the Product.

161.   Had the Plaintiff and putative Class Members known the truth about the qualities of the Product, and the dangers and hazards associated with using the Product, they would not have purchased it.

162.   As a direct and proximate result of Defendants' fraudulent acts and omissions, the Plaintiff and the putative Class Members were injured and damaged.

163.   As a direct and proximate result of Defendants' fraudulent acts and omissions the Plaintiff and putative Class Members are entitled to legal and equitable relief including compensatory and punitive damages, costs, attorneys' fees, rescission, and all such other relief deemed appropriate by the Court.

## COUNT VI
## NEGLIGENT DESIGN AND FAILURE TO WARN
### (On behalf of the Nationwide Class)

164.   Plaintiff, individually and for the Class, incorporates by reference all preceding paragraphs as though fully set forth herein.

165.   Plaintiff asserts this cause of action on behalf of herself and the Nationwide Class.

166.   At all times material to this action, Defendants were responsible for designing, formulating, testing, manufacturing, inspecting, packaging, marketing, distributing, supplying and/or selling the Product to the Plaintiff and putative Class Members.

167.   At all times material to this action, the Plaintiff and putative Class Members' use of the Product was in a manner that was intended and/or reasonably foreseeable by Defendants. However, as set forth herein, use of the Product as directed by Defendants involved and continues to involve a substantial risk of producing Injuries.

168.   At all times material to this action, the risk of sustaining Injuries was known to the Defendants or by exercising reasonable care should have been known to Defendants, in light of the generally recognized and prevailing knowledge available at the time of manufacture, design, distribution and/or sale.

169.   Defendants, as self-professed "hair color experts"[1] knew—or by the exercise of reasonable care should have known—that the Product had and continues to have design defects.

170.   In fact, the Product is not at all a safe hair dyeing product. As set forth herein, there is more than ample evidence demonstrating that PPD is not safe for use on the skin. Defendants, as self-professed "hair color experts"[1], knew, or should have known, that PPD could cause Injuries. Defendants nonetheless failed to adequately disclose this vital information to consumers, including the Plaintiff and putative Class Members.

171.   Defendants knew that the Plaintiff and putative Class Members - who purchased and used the Product for its intended use and as directed by Defendants - were and are members of a foreseeable class of persons who were and are at risk of suffering serious inconvenience, expense, and/or Injuries solely because of the Products design defects.

172.   Defendants, as the designers, manufacturers, distributors, marketers and/or sellers of the Product, had a duty to exercise reasonable care for the safety of the Plaintiff and putative Class Members who used, were using and/or intend to use the Product as directed by Defendants. Since Defendants produced, manufactured, distributed, and/or sold the Product, (1) they owed a non-delegable duty to consumers, including the Plaintiff and putative Class Members, to exercise

ordinary and reasonable care to properly design the Product, and (2) they had a continuing duty to adequately warn about the true dangers, hazards, and/or risks of suffering Injuries associated with the intended use of the Product, as described herein.

173.  Notwithstanding the aforementioned duty, Defendants were negligent by one or more of the following acts or omissions in that the Defendants:

  a.  Failed to give adequate warnings to purchasers and users of the Product, including the Plaintiff and putative Class Members, regarding the risks and potential dangers of using the defective Product as directed by Defendants;

  b.  Failed to recommend and/or provide proper warnings to ensure the safety of the Plaintiff and putative Class Members of using the defective Product as directed by Defendants;

  c.  Failed to adequately investigate the safety hazards associated with the intended use of the Product;

  d.  Negligently designing a Product with serious safety hazards and risks; and

  e.  Oversold the benefits while minimizing the true risks of suffering Injuries associated with use of the Product.

174.  Defendants knew, or by the exercise of reasonable care should have known (1) of the true inherent design defects and resulting hazards and dangers associated with using the Product as directed by Defendants, and (2) that the Plaintiff and putative Class Members could not reasonably be aware of the true risks. Thus, Defendants failed to exercise reasonable care in providing Class

Members with adequate warnings regarding the potential for sustaining Injuries when using the Product as directed by Defendants.

175.   As a direct and proximate result of Defendants' negligent design and failure to adequately warn consumers that use of the Product could cause Injuries, the Plaintiff and putative Class Members have suffered damages as set forth herein.

176.   As a direct and proximate result of Defendants' negligent design and failure to adequately warn consumers that use of the Product could cause Injuries, the Plaintiff and putative Class members are entitled to legal and equitable relief including compensatory and punitive damages, costs, attorneys' fees, rescission, and all such other relief deemed appropriate by the Court.

## PRESERVATION CLAIMS

177.   Plaintiff, individually and for the Class, incorporates by reference all preceding paragraphs as though fully set forth herein.

178.   To the extent that Defendants may claim that the Plaintiff and/or the Class Members' claims are barred by the applicable statute of limitations, Plaintiff and the Class Members assert that the statute of limitations is and has been tolled by, *inter alia*, Plaintiff's and the Class Members' discovery that their injuries were directly and proximately caused by the Product and Defendants' failure to properly and adequately warn of the true risks and dangers associated with use of the

Product, as set forth *supra*, and/or after any actionable Injury(ies) was/were sustained by the Plaintiff and/or the putative Class Members.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendants, as follows:

a.  For an order certifying the Class under FEDERAL RULE OF CIVIL PROCEDURE 23;

b.  For an order and naming the Plaintiff as representatives of the Class and Subclass;

c.  For an order naming Plaintiff's counsel as Class Counsel to represent the Class and Subclass;

b.  For an order declaring that Defendants' conduct violates the statutes and/or laws referenced herein;

c.  For an order finding in favor of the Plaintiff, the Class and the Subclass on all counts asserted herein;

d.  For compensatory, statutory, and punitive damages in amounts to be determined by a jury and/or the Court;

e.  For prejudgment interest on all amounts awarded;

f.  For an order of restitution and all other forms of equitable monetary relief, including disgorgement of all profits and ill-gotten monetary gains received by Defendants from sales of the Product;

g.  For an order enjoining Defendants from continuing the unlawful practices detailed herein; and

h.  For an order awarding the Plaintiff, the Class and the Subclass their reasonable attorneys' fees and expenses and costs of suit.

## PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

/s/ W. Lewis Garrison, Jr.
W. Lewis Garrison, Jr.
wlgarrison@hgdlawfirm.com
Brandy Lee Robertson
brandy@hgdlawfirm.com
HENINGER GARRISON DAVIS, LLC
2224 First Avenue North
Birmingham, AL 35203

K. Stephen Jackson
steve@jacksonandtucker.com
Joseph L. "Josh" Tucker
josh@jacksonandtucker.com
JACKSON & TUCKER, P.C.
2229 1st Ave. North
Birmingham, AL 35203-4203
Telephone: 205.252.3535
Facsimile: 205.252.3536

**<u>Please serve the Defendants by Certified Mail as follows</u>:**

Coty, Inc.
Corporation Service Company
2711 Centerville Road
Suite 400
Wilmington, Delaware 19808

The Procter & Gamble Company, Inc.
CT Corporation System
1300 East Ninth Street
Cleveland, Ohio 44114

The Procter & Gamble Manufacturing Company, Inc.
CT Corporation System
1300 East Ninth Street
Cleveland, Ohio 44114

The Procter & Gamble Distributing, L.L.C.
The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware 19801

Procter & Gamble Hair Care, L.L.C.
The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware 19801